<pre>
 1                UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF OHIO
 2                     WESTERN DIVISION

 3   UNITED STATES OF AMERICA,    )  Docket No. 3:12CR431

 4           Plaintiffs,          )  Toledo, Ohio

 5           v.                   )  December 20, 2013

 6   DUANE HILL,                       )  Sentencing

 7           Defendants.          )

 8   ------------------------------

 9             TRANSCRIPT OF SENTENCING HEARING
             BEFORE THE HONORABLE JAMES G. CARR
10              UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the Plaintiffs:  Alissa Sterling
                          Office of the U.S. Attorney
14                        Four SeaGate, Suite 308
                          Toledo, Ohio 43604
15                        (419) 242-5675

16

17   For the Defendant:
                          Paul L. Geller
18                        434 Spitzer Building
                          Toledo, Ohio 43604
19                        (419) 787-8867

20

21   AND

22            Mark C. Geudtner
              610 Adams Street, 2nd Floor
23            Toledo, Ohio 43604
              (419) 242-5506

24

25   Court Reporter:     Angela D. Nixon, RMR, CRR
                         (419) 260-5259
</pre>

1

2   Proceedings recorded by mechanical stenography, transcript

3   produced by notereading.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          COURTROOM DEPUTY:  Case 3:12CR431, United States

2    of America versus Duane Hill.

3          THE COURT:  Okay.  The record should show that

4    the defendant's present in court with his attorney and is

5    this on by the way?  Actually two attorneys, Mr. Mark

6    Geudtner and Mr. Paul Geller.  Government's represented by

7    Assistant United States Attorney Alissa Sterling.  Also

8    present is Ms. Shawna Sizemoore, United States Pretrial

9    Service and Probation Officer.  This matter has been

10   continued today -- to today for a hearing on an oral motion

11   made by the defendant to vacate his plea following that

12   motion and determination which led to the termination of

13   the sentencing proceedings on Monday.  I set this, as I

14   say, for hearing today on that motion, and had the

15   magistrate appoint Mr. Geudtner for purposes of

16   representing the defendant at that motion.

17          Mr. Hill, I have a simple question for you.  How

18   do you want to proceed today?  Do you want to proceed on

19   the motion to withdraw?  Do you want Mr. Geudtner to

20   undertake to persuade me that good cause appears for your

21   request to withdraw, or do you want me to proceed to

22   sentencing?  It's entirely up to you.  What do you want to

23   do?

24          THE DEFENDANT:  I would like to proceed with

25   sentencing.

1          THE COURT:  Okay.  So you would withdraw your

2    previously made oral motion to vacate your plea?

3          THE DEFENDANT:  Yes.

4          THE COURT:  And have you had a chance to consult

5    with Mr. Geudtner about that motion and how you should

6    proceed?

7          THE DEFENDANT:  Yes.

8          THE COURT:  And are you fully and completely

9    satisfied that he gave you and that motion enough time and

10   attention to be in a position to advise you adequately and

11   thoroughly about the different options that were ahead of

12   you?

13         THE DEFENDANT:  Yes.

14         THE COURT:  And the actual and/or potential

15   consequences of pursuing those options?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Is there anything that you asked

18   Mr. Geudtner to do that he did not do?

19         THE DEFENDANT:  No.

20         THE COURT:  Is there anything that you told him

21   not to do that he did do?

22         THE DEFENDANT:  No.

23         THE COURT:  And you did read the presentence

24   report?

25         THE DEFENDANT:  Yes.

1          THE COURT:  And did Mr. Geller go over it with

2   you?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Did he answer any questions you may

5   have had about it?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Did Mr. Geudtner happen to review it

8   with you, or was that not the focus -- I don't want to know

9   what you talked about, but let me just ask, did he go over

10  the pre-sentence report with you?

11         THE DEFENDANT:  No.

12         THE COURT:  That's fine.  But Mr. Geller did?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Okay.  And Mr. Geller has represented

15  you from the time you were arrested or indicted; is that

16  correct?

17         THE DEFENDANT:  Yes.

18         THE COURT:  And has he met with you from time to

19  time?

20         THE DEFENDANT:  Yes.

21         THE COURT:  And about how many meetings, best of

22  your recollection, I'm not asking for precise count, but

23  about how many meetings?

24         THE DEFENDANT:  Fifteen.

25         THE COURT:  And were they -- where were you

1    housed at the time, here or up in Milan?

2              THE DEFENDANT:  Both.

3              THE COURT:  Okay.  And did those meetings take

4    place in person?

5              THE DEFENDANT:  Yes.

6              THE COURT:  Were any by video conference, as best

7    you can recall, okay?

8              THE DEFENDANT:  Just the presentence

9    investigation.

10             THE COURT:  Just the review of the report?

11             THE DEFENDANT:  Yes.

12             MR. GELLER:  That was for the investigation when

13   Ms. Sizemoore spoke to him.  I personally was with him --

14             THE COURT:  I see, meeting with the probation

15   officer?

16             MR. GELLER:  Correct.  I was with him.

17             THE COURT:  I understand.  I believe, Mr. Hill,

18   on Monday I put you under oath; is that correct?

19             THE DEFENDANT:  Yes.

20             THE COURT:  You understand that you remain under

21   oath and have been under oath while we've been talking this

22   afternoon?

23             THE DEFENDANT:  I'm aware now.

24             THE COURT:  You're aware now.  Would you like me

25   to have you sworn again?

1     MS. STERLING:  Yes, Your Honor.  I could be

2  wrong, but I don't believe we got to that portion.

3     THE COURT:  Why don't we go ahead and place

4  Mr. Hill under oath.

5                    DUANE HILL,

6  was herein, called as if upon examination, was first duly

7  sworn, as hereinafter certified, and said as follows:

8     THE COURT:  Mr. Hill, let's assume for the moment

9  that I hadn't placed you under oath last time.  I just

10  have, if I were to ask you this afternoon the same

11  questions I just asked you now that you are clearly under

12  oath, would your answers be the same?

13     THE DEFENDANT:  Yes.

14     THE COURT:  And throughout the course of your

15  meetings with Mr. Geller, do you believe that you are able

16  to come to an understanding of what the government's

17  evidence likely would be if you went to trial?

18     THE DEFENDANT:  Yes.

19     THE COURT:  So you feel yourself, to the extent

20  that you can have that understanding, generally and fully

21  aware of what the government would have presented at trial

22  had you gone to trial?

23     THE DEFENDANT:  Yes.

24     THE COURT:  And are you satisfied that had you

25  gone to trial, that the likelihood of conviction would have

1    been pretty great?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Maybe, not sure and certain, but a

4    whole lot more likely than not?

5              THE DEFENDANT:  Yes.

6              THE COURT:  And is it your understanding that if

7    you had gone to trial, your potential sentence might have

8    been a lot greater than it might be today?

9              THE DEFENDANT:  Yes.

10             THE COURT:  And Mr. Geller discussed those things

11   with you?

12             THE DEFENDANT:  Yes.

13             THE COURT:  Answered any questions you might have

14   had about it?

15             THE DEFENDANT:  Yes.

16             THE COURT:  And I don't want to know what he told

17   you, but he's giving you his advice and suggestions about

18   what seemed to be the best choice among some terrible

19   choices, do you understand what I'm saying?

20             THE DEFENDANT:  Yes.

21             THE COURT:  Nothing looked real good, right?

22             THE DEFENDANT:  Right.

23             THE COURT:  Everything looked more awful than you

24   could have imagined?

25             THE DEFENDANT:  Right.

1          THE COURT:  Especially at your young age.  But

2    are you confident that he thought through what it was he

3    was suggesting to you, number one, that he gave it thought

4    and attention before he said, you know, I really think you

5    should do this, that or the other thing?

6          THE DEFENDANT:  Yes.

7          THE COURT:  And are you confident that to the

8    best of your understanding, he also was aware of the likely

9    evidence and the consequences of going to trial and being

10   convicted?

11         THE DEFENDANT:  Yes.

12         THE COURT:  At any time did Mr. Geller do

13   something you told him not to do?

14         THE DEFENDANT:  No.

15         THE COURT:  At any time did he fail to do

16   something that you told him to do?

17         THE DEFENDANT:  No.

18         THE COURT:  In other words, if you told him to go

19   see a witness, or think about a particular motion, or have

20   a certain discussion with anybody, did he do those things?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Or at least he told you he did them,

23   correct?

24         THE DEFENDANT:  Correct.

25         THE COURT:  Obviously you couldn't go out and be

1    with him because you were detained, but he would come back

2    and he would say I talked to so and so, I'm going to file

3    this motion, or I'm not going to file this motion.  And I

4    talked to the prosecutor or whatever it was, he confirmed

5    that he had done what you asked him to do.

6         THE DEFENDANT:  Yes.

7         THE COURT:  Okay.  Let me confirm the -- well,

8    first of all, does counsel, just to confirm again, have you

9    each received and reviewed the presentence report?  If so,

10   do you have any objections?  And if not, are you prepared

11   to proceed with sentencing?

12        MS. STERLING:  Your Honor, we -- on behalf of the

13   government, we have had an opportunity to thoroughly review

14   the presentence report.  We find it to be accurate in all

15   respects, agree with the guideline calculations in there

16   and have no objections.

17        THE COURT:  Okay.  Mr. Geller, have you received

18   and reviewed the presentence report?  If so, do you have

19   any currently pending objections that haven't been

20   resolved?  And if not, are you prepared to proceed with

21   sentencing?

22        MR. GELLER:  Your Honor, we do have objections to

23   the acceptance of responsibility and the enhancement.

24        THE COURT:  I'm going to overrule those

25   objections.  I believe that the pretrial report accurately

1   reflects the circumstances, and the defendant, having

2   undertaken however futile, particularly in the final

3   analysis to withdraw his plea, I do have concerns about

4   acceptance of responsibility, but I will hear you with

5   regard to a variance.  Do you understand that?

6         MR. GELLER:  Yes, I do, Your Honor.  Can I have

7   one second?  I'll explain what you just said to him.  He

8   does understand, Your Honor.

9         THE COURT:  Okay.  Okay.  So basically if, and

10  correct me if I'm wrong.  I'm just reviewing the report.

11  You object to the withholding of the three-point acceptance

12  of responsibility and the imposition of a two-point

13  enhancement; is that correct?

14        MR. GELLER:  That's correct.

15        THE COURT:  As presently calculated, just to

16  confirm the guideline range, base offense level 36,

17  criminal history category three.  The guideline range as to

18  Count 1 is 60 months, as to Count 2, 235 to 293 months, as

19  to Count 3, 235 to 240 months; is that correct?

20        MS. STERLING:  Yes, Your Honor.

21        THE COURT:  Mr. Geller?

22        MR. GELLER:  No -- yes, that's correct, Your

23  Honor.

24        THE COURT:  Okay.  And if those five points had

25  been on the credit sign of the ledger, the base offense

1   level would have been a 31.

2           MR. GELLER:  Correct, Your Honor.

3           THE COURT:  Criminal history category three, with

4   a guideline range of 135 to 168 months?

5           MR. GELLER:  That's correct.

6           THE COURT:  And I will take that into

7   consideration in determining whether a variance is

8   appropriate.  There is also a term of supervised release as

9   to Count 1 and 3, three years; Count 2, five years and

10  there is a restitution of $300.  And is there -- excuse me,

11  special assessment, restitution of.

12          PROBATION:  Yes, Your Honor, there's a request

13  for $240 of restitution.

14          THE COURT:  Okay.  And okay.  There's no plea

15  agreement; is that correct?

16          MS. STERLING:  That is correct, Your Honor.

17          THE COURT:  Okay.  I do not want to forget this

18  because it's important.  Normally I wait until the end of

19  sentencing.  Because there's no plea agreement, among other

20  things you retain your right to appeal your conviction and

21  your sentence if grounds for appeal appear to exist.  You

22  have 14 days from today when I will enter my judgment to

23  file a notice of appeal.  Talk to Mr. Geudtner and

24  Mr. Geller and get their best assessment of whether an

25  appeal might have some merit.  Do you understand what I've

1  said?

2          THE DEFENDANT:  Yes.

3          THE COURT:  If they -- if they believe that it

4  does, then by all means have one of them file a notice of

5  appeal on your behalf within 14 days.  If you fail to do

6  so, you will lose forever whatever right you might

7  otherwise have to challenge your conviction and your

8  sentence by way of direct appeal, post conviction relief

9  under 28 U.S. Code Section 2255, habeas corpus or

10  otherwise.  Do you understand that?

11          THE DEFENDANT:  Yes.

12          THE COURT:  I will simply say that I have

13  overruled two objections that may have a significant effect

14  upon your sentence.  I do so on the basis of the statements

15  by the probation officer, which I -- in response to those

16  objections which I believe are not well taken, the

17  objections are not.  I believe they're a statement in

18  response thereto is well taken, and also as indicated

19  having sought, I realize on a spur of the moment in an

20  offhand way perhaps about the benefit of talking to anybody

21  else, to withdraw your plea, that plus the other

22  circumstances which the probation officer notes, is the

23  reason for my denial of acceptance of responsibility.  I am

24  aware of the effect upon those -- that decision upon the

25  advisory guideline range of sentencing.  But the main

1   thing, if you want to appeal if after today you're unhappy

2   with what I've done and believe that I've somehow violated

3   the law and your rights, if you wish to appeal, you must

4   file a notice of appeal within 14 days.  Do you understand

5   that?

6            THE DEFENDANT:  Yes.

7            THE COURT:  Okay.  On behalf of the government?

8            MS. STERLING:  Thank you, Your Honor.

9            THE COURT:  And there is -- I have taken

10  cognizance of the victim impact statement, and of course

11  that will be taken into consideration, or I will take it

12  into consideration in making my decision.  And if you wish

13  to either comment or have someone speak further on that,

14  now is probably the time to do so.

15           MS. STERLING:  Thank you, Your Honor.

16           THE COURT:  If you wish.  It's up to you.

17           MS. STERLING:  Thank you, Your Honor.  I would

18  note for the record that I begin my comments here today

19  that one of the investigating officers is here, Task Force

20  Officer Pete Swartz from the Toledo Police Department, he's

21  a member of the Northwest Ohio Internet Crimes Against

22  Children.

23           THE COURT:  Perrysburg police, did you say?

24           MS. STERLING:  No, Toledo Police Department

25  detective.

1      THE COURT:  And he's welcome to come sit up at

2  counsel table if he wishes.

3      MS. STERLING:  I welcomed that, he doesn't feel

4  like he's dressed appropriately for court.

5      THE COURT:  Doesn't matter.

6      MS. STERLING:  I told him that as well, but I

7  think he's fine where he is.

8      THE COURT:  I suppose he would come on up if I

9  ordered him to do so but I won't do that.  Okay.  I

10  understand.

11      MS. STERLING:  Thank you, Your Honor.  Also

12  present for the record is the victim guardian ad litem

13  attorney Maggie Mattimo.  She's been actively involved

14  throughout the case, was here on Monday and was kind enough

15  to adjust her schedule to return here today.  I begin my

16  comments, I suspect where the facts giving rise to the

17  instant case before The Court began, and that is in the

18  spring of 2012.  And I do that because I think it's

19  important that Your Honor has the context in which the

20  defendant's actions occurred.

21      Specifically on April 19th of 2012 this defendant

22  was arrested for promoting prostitution in Wood County when

23  Sharena Murphey (phonetic) was arrested in an undercover

24  sting operation by Wood County officials.  The facts of

25  that investigation revealed that this defendant drove

1    Sharena to the Motel 6.  When he was arrested, he first

2    claimed that she was just a friend who he had dropped off

3    to party.  He later then claimed that she was his step

4    sister, and although he gave her a ride to the motel, he

5    had no idea why she wanted to go there.  Also false fact

6    because she's not his step sister.  Sharena was interviewed

7    at the time of her arrest of the prostitution and said the

8    defendant took the photos of her that was posted on

9    backpage.com that the undercover officer had ordered the

10   date up on.  She indicated the defendant had used prepaid

11   cards to pay for the backpage adds, some of which the

12   defendant had on his person at the time of his arrest.

13   Your Honor, in April of 2012.  She indicated that she had

14   been prostituting for him for a while.  In fact, he gave

15   her rides to her dates, and she was aware of several other

16   girls that he was prostituting, all of whom gave him their

17   money in exchange for him providing them with clothing and

18   food.

19          And finally, she indicated that he gave her

20   condoms to use on this specific occasion in April of 2012.

21   Defendant was arrested, as I said, he was released on bond

22   on April 23rd, and later indicted for that charge in Wood

23   County in June of 2012.  He remained on bond, of course,

24   with certain conditions that are standard in cases of that

25   nature.  In the shadow of all of that, Your Honor, it is

1    what brings us to the primary facts that led to the federal

2    prosecution, that is the sex trafficking of a minor as

3    charged in Count 2 of the indictment.  The victim in this

4    case was 16 years old at the time that the defendant posted

5    her pictures on back page and started prostituting her.  I

6    would tell The Court that she was in the custody of a

7    family member who was her guardian, Natasha Parker.

8    Ms. Parker received information that the victim was posted

9    on backpage.  She went on, confirmed that for herself.  Of

10   course she was -- she was a minor at the time.  So her

11   guardian contacted backpage and reported that, asked them

12   to take that down.  She had numerous conversations with the

13   victim in this case who was a runaway throughout periods of

14   time of the relevant conduct here in.  But she this

15   conversation with her, she was very concerned, obviously

16   was suspicious about her comings and goings and the

17   activities she was involved in.  And the victim told her

18   that this defendant was her boyfriend and that he had

19   talked her into prostituting.

20          On the day of the incident where this minor, this

21   victim in our case was arrested, Your Honor, she traveled

22   to the motel, again a Motel 6, this time here in Toledo,

23   with her cousin, a young lady by the name of Sivney Davis

24   (phonetic).  Sivney was not a minor at the time but she

25   traveled with her, and that was so because the ad that the

1   undercover officer responded to suggested that while you

2   could have one of these girls for a date, why not have two

3   or words to that effect.  And so she -- the victim happened

4   to be with her cousin at the time that she got the call and

5   talked her into going along with her.  She was with the

6   victim when the two defendants charged in this case, this

7   defendant and Mr. Devault, she's yet to be sentenced, Your

8   Honor, picked them up and took them to the Motel 6.  She

9   says that prostitution was discussed openly in the vehicle

10   on the way to the motel.  It was discussed who would do

11   what.  There was discussion about money, there was

12   discussion about condoms.  In fact, they didn't have any,

13   and there was a discussion about going to a nearby gas

14   station to get some which they ultimately did.

15          THE COURT:  Stealing them, correct?

16          MS. STERLING:  Yes, Your Honor.  In fact,

17   Ms. Davis says that this defendant told her if you get

18   arrested, just tell the police that you only know me as

19   Strong, and that I just gave you a ride to the motel.  That

20   was the cover story that she was supposed to use.  She

21   further identified this defendant as her cousin's pimp,

22   said her cousin had admitted to her that this defendant had

23   been prostituting her for about three months.  And then of

24   course we get to the victim statement.  On the date of the

25   sting operation on August 8th, 2012 when she was arrested.

1    First of all, it's important to know that she never denied

2    that she was there to prostitute, nor could she, quite

3    frankly, given the conversation with the undercover officer

4    in the hotel room.  Initially she stuck with the cover

5    story, said Strong rented the room for her, but claimed he

6    didn't know what she was going to use the room for.  Of

7    course Your Honor's well aware of the evidence in the case

8    and that this defendant rented the hotel room on

9    August 8th, 2012.  She initially denied giving Strong any

10   money, but later claimed she did, in fact, give him money

11   for driving her around.  She was interviewed again a few

12   days later by a victim witness specialist with the FBI,

13   which was recorded.  Your Honor, it's painful to watch.

14   And Ms. Sizemoore can tell you, she came over and watched

15   it in my office.  It's one of those things that you don't

16   really need audio.  You could watch and understand what she

17   was going through just to look at her.  Her body language

18   said it all.  She's got her arms pulled into her sleeves.

19   She's wrapped up like this when she's so focused on this

20   defendant and what's happened to him and what's going on

21   and still in this protection mode for him, no concern for

22   himself -- for him.

23       When she discovers that he's being charged, he's

24   been arrested, she cries out as if in physical pain.

25   That's how upset she is to think that she had something to

1    do with this.  And of course now she has been, and I'm not

2    sure of the amount of time, if The Court's interested in

3    that, Ms. Mattimo can answer that she has been in a

4    treatment facility for an extended period of time.  Now of

5    course she realizes what he did to her.  And I can't

6    articulate it better than she does in the victim impact

7    statement and I'm not going to.  She readily acknowledged

8    that he used her, that he manipulated her and that he

9    turned her out.  You know, Mr. Geller puts in the

10   sentencing memorandum that, oh, his client just kind of

11   came in on the tail end of this and this victim in

12   particular, as well as the others they were all

13   prostituting beforehand, he just got in, you know, enjoyed

14   the fruits of their labor as he called it.  There's no

15   evidence of that whatsoever.  In fact, to the contrary.

16   The victim says that this is the first time that she

17   prostituted, was at his direction.

18          And let's talk, Your Honor, about the defendant's

19   statement.  He was interviewed at the Wood County Jail with

20   his attorney, Mr. Geller as well as AUSA Hurley.  Also, I

21   believe was back in August of 2012, because, of course, he

22   ran from the scene of the sting operation, he and

23   Mr. Devault both ran, hid out for awhile until they were

24   able to get other people to come give them rides away from

25   the area.  His bond, however, was revoked in the Wood

County case, and he was subsequently picked up.  And while
he was in the Wood County jail, he made statements that are
the factual basis for the obstruction count in the
indictment to which he's pled guilty and been found guilty.
Specifically he denies knowing the co-defendant's last
name, completely false, Your Honor.  He acknowledges in the
PSR now that he grew up with Mr. Devault, that he knew him
from over on Belmont.  At that time he said he only knew
the victim for a week or two before the sting at the hotel.
Again, completely false.  He now says that he had been
prostituting her for a few months before, and of course he
denied that he had stopped at a Speedway to buy condoms
before the incident.  The officers pushed him on that and,
Your Honor, that might seem like a minor point, they pushed
him over and over.  Are you sure you didn't go there, you
sure you didn't go there.  He just would not admit it.
Video evidence, oh, I guess we did, denies stealing, push,
push, push, again just won't come off of it.  When they
asked him why he lied, he said, and this is in the 302,
Your Honor, which I'm sure is attached.  He deliberately
lied to mislead investigators so that he would not get into
trouble for what he did.  He denied ever being on backpage
or posting any girls for prostitution at that time.  We
know that's clearly false based upon the evidence that's
before The Court, not to mention his comments to

1    Ms. Sizemoore during the PSR.  He said he thought they were

2    going to Motel 6 to party, and he didn't know they were

3    going there to prostitute.  Potentially that could be a

4    plausible argument, Your Honor, but for the April incident

5    where he tried to use the same story.  And of course his --

6             THE COURT:  And you have the credit card tracks.

7             MS. STERLING:  That's my next comment, Your

8    Honor.  His phone number was the phone number used to set

9    up the date, and there was open discussion in the vehicle

10   about the prostituting.  Today, as we sit here today, I

11   haven't heard him speak yet.  Of course he hasn't been

12   given a chance, but in the PSR when he's interviewed by

13   Ms. Sizemoore, he still has the audacity to say I'm not a

14   pimp.  He denies he's a pimp.  He admits he made $5,000 off

15   of prostitution activities.  Again, I point to The Court

16   the fact that under the shadow of having already been

17   charged and indicted, he continues to go out and commit

18   these kind of crimes, and now has picked up a minor.

19             And finally, Your Honor, I want to leave you --

20   the evidence in this case included, as always with the

21   federal agencies, a thorough review of electronic data.

22   Specifically, you know, whether it's Twitter or Facebook or

23   whatever it might be.  They always, you know, pursue all

24   avenues and try and piece together bits of information.

25   And this defendant, it's very apparent on his Facebook

1    page, Your Honor, under the work tab, he lists "break a

2    bitch down," and lists himself as "the boss."  And I ask

3    you to think about that, Your Honor, about how he describes

4    himself, and to think about his victim when you're imposing

5    a sentence here today.  Thank you.

6               THE COURT:  Mr. Geller, on behalf of your client?

7               MR. GELLER:  Yes, Your Honor.

8               THE COURT:  Of course I have read your sentencing

9    memorandum.  You may proceed.

10              MR. GELLER:  May it please The Court, obviously

11   nothing positive can be said about prostitution,

12   prostitution of young girls, but I think The Court has to

13   look at the realm that he is in as compared to others who

14   have come before this court and other courts.  This

15   actually all started, the conspiracy with three other

16   people, one young lady, Anesha, who was his girlfriend at

17   the time from all my understanding, and by her own

18   admission and my interviewing her, she -- and again,

19   there's no excuses.  This behavior is never an excuse.  She

20   was doing it, there were postings, he got involved in it.

21   And that's what continued.  Anesha wound up being pregnant

22   and she stopped, but for a period of several months, they

23   were together, they were boyfriend, girlfriend.  Court

24   shows -- he's totally admitted it.  Down the road with

25   Sharena Murphey, she was in the neighborhood and, in a

1    sense, we can't deny because of her addiction she wanted to

2    make money, and therefore, he was aware of that from the

3    neighborhood.  So he participated.  Again, making no light

4    of it, or minimizing it, he was introduced, according to

5    him, his mother who's in court today who I have every

6    believability to A.W. through Taurus Devault, and they

7    developed a friendship, a relationship.  There's some

8    debate how long that was, three, four, five, six, seven

9    weeks, even one time Taurus Devault brought A.W. to the

10   wedding reception that he was at, the mother verified that,

11   that she was brought so they were together.  Shawna

12   Sizemoore puts down in her report, and she indicates about

13   the minor victim and her engaging in this, it doesn't

14   excuse anything, that's the hard part, because it's not

15   excusable.  But in sentencing, it has to be where does he

16   fit in the realm of people who are prostituting, pimp,

17   whatever word you want to use, pimp is an ugly word, maybe

18   he doesn't consider himself in the classic sense where he

19   recruits the girl.  It's sort of interesting, and I know

20   there was a lot of discussion whether the girl who

21   literally introduced him, to my understanding, to the world

22   of prostitution or the world of backpage, they thought

23   about charging her because she clearly was heavily

24   involved.  She picked him up at the motel that night and

25   A.W. was arrested or taken into custody when that set up

1    was made.  But yet, and maybe it's a good thing, maybe

2    she's learned her lessons from all this, but she was as

3    much involved, and I think the police are well aware of it,

4    but that doesn't take away his responsibility.  To him, in

5    a sense, it was sort of a sad game because it was a way of

6    making money, how willing a participant is, a

7    psychological, A.W, at her young age obviously cannot make

8    those decisions.  There's no question she lived a very

9    troubled lifestyle.  And that lifestyle was picked up on.

10   I've known Duane now probably six, seven, eight years,

11   probably him and his mother.  I've represented him in his

12   other matters, starting with a little incident at the

13   Maumee theaters where he was not at fault and the case in

14   front of Judge McDonald.  He's not a vicious violent

15   person.  He has -- he's very immature.  His relationship

16   with females, he has, I think the probation report says

17   six, but he says seven children.  He's in close contact

18   with most of the children.  His mother has brought them up

19   to the jail, these children, and so has some of the mothers

20   who he still stays in contact with.

21              THE COURT:  And I note six children by six

22   different women.

23              MR. GELLER:  Right.

24              THE COURT:  Is one a year.

25              MR. GELLER:  Excuse me?

1           THE COURT:  One a year.

2           MR. GELLER:  There's no question that's that

3    immaturity, irresponsibility, Your Honor.  I'm not

4    minimizing it.

5           THE COURT:  Who's going to care for those

6    children?  Who's going to provide support?  Who's going to

7    bring them up to know something about right and wrong?

8    Their grandmother, their aunt, their mothers, their

9    mothers.  Candidly, I'll be very honest, I don't comprehend

10   that behavior.  I live in a different world, I understand

11   that.  But the attitude of reckless indifference towards

12   young women that that kind of conduct shows, again and

13   again and again and again, candidly, is one of those

14   natures and circumstances of the defendant whose

15   background, history and characteristic that I take into

16   account.  I just want you to know that.

17          MR. GELLER:  But I would say, Your Honor --

18          THE COURT:  Those children are doomed.  The

19   likelihood that they're going to wind up sitting where he

20   is in some court somewhere is so overwhelmingly

21   substantial.  There's nothing I can do about it.  Nothing

22   anybody can do about it.  He didn't care.  And I really

23   think that that's kind of a emblematic as read this

24   presentence report.  May have nothing directly to do with

25   the crimes that he's committed as acknowledged and pled

1    guilty to committing, but it tells me something about his

2    basic character and attitude towards other people.  But go

3    ahead.

4         MR. GELLER:  But as I was indicating, I've seen

5    him with his children when in custody because when I

6    visited other people, and, you're right, his family who is

7    sitting here today, a very strong good family, his mother

8    did have him, that's her only child, and to be honest with

9    The Court, his mother is well aware of two things, the

10   irresponsibility, but also his love for his children and

11   how he does, in a sense, not in the traditional sense, he

12   does have relationships with the different children, and he

13   has kept relationships as far as trips with their mothers

14   so that these children have been visiting him while up in

15   Milan.  There's no question when he got arrested the first

16   time and then he was released on bond, when he spoke to the

17   police officers, they had all the videos, I was with him.

18   It was, as The Court said, it's this reckless indifference

19   in the committing of a crime not thinking and committing

20   criminal acts.  And basically at that time the police knew

21   everything.  He did tell them who the other person was, he

22   described him and everything else about him, so it wasn't

23   very hard.  Mr. Devault was eventually picked up.

24        And I noticed at least Mr. Hill admits that

25   the -- starting what he was doing goes back to the

1   beginning to the young lady named Ronesha (phonetic).  But

2   there's other things that went on for a period of time.  He

3   was with Mr. Devault quite a bit, the two of them went

4   together.  There's no excuses for what happened.  It comes

5   out to the level of where would put him between the ten

6   year, the guidelines if he had the 31, criminal history

7   category three, and the 36 criminal category like I put in

8   my memorandum, where's he fit as far as the violence, his

9   arrest, the coercion, he doesn't get any award, even on the

10   low end of the variance around a 31.  If The Court wants to

11   go there, which we're obviously asking The Court to do,

12   that's a long time.  If The Court goes higher, and gives --

13   he will be getting the same sentences that people who beat

14   up these girls.

15        THE COURT:  I sentenced someone last year in

16   Arizona to 140 months that committed thoughtless, senseless

17   murder, pled to second degree, okay, so I understand.

18        MR. GELLER:  Okay.

19        THE COURT:  Okay.

20        MR. GELLER:  What I'm saying to The Court is

21   we're asking for a fair sentence.  There's a lot of things

22   he's done wrong in his life.  There's a lot of immaturity,

23   but I'm just asking The Court to look within the range of

24   what he has done and that, as bad as it is, he's not --

25   he's far from the worse that this court has seen.  Thank

1    you.

2              THE COURT:  Mr. Hill, you have the right to speak

3    on your own behalf before I decide --

4              MR. GUEDNTNER:  Your Honor, may I briefly address

5    The Court?

6              THE COURT:  Mr. Geudtner, of course.  By all

7    means.

8              MR. GUEDNTNER:  Judge, I come to this case rather

9    lately, in fact, just since Monday of this week.  But I've

10   had the opportunity to review the docket sheet and all the

11   documents referenced there, as well as Ms. Sizemoore's

12   presentence investigation report.  And it occurs to me in

13   reviewing the case materials -- and I have not, I have to

14   say, had an opportunity to review all the discovery

15   materials but it occurs to me that if proportionality is

16   the basis for and the objective of the United States

17   sentencing guidelines, The Court should consider and

18   compare Mr. Hill's case to another very similar case that

19   Your Honor sentenced in this courthouse in June of this

20   year.  That would be case of my former client Roy Calhoun.

21   Mr. Calhoun received a sentence of 15 years pursuant to a

22   plea agreement that he entered into with AUSA James Maroni

23   of Cleveland and Ava Dustin of Toledo.  In that case the

24   government and the defendant entered into an agreement

25   pursuant to Criminal Rule 11(c)(1)(C).

1          THE COURT:  I remember that.  Go ahead.

2          MR. GUEDNTNER:  Agreeing to a sentence of 15

3     years.  Like Mr. Hill here, Mr. Calhoun was convicted of

4     conspiracy to engage in prostitution and sex trafficking of

5     children under the age of 18.  Mr. Calhoun was also

6     convicted of a separate drug trafficking conspiracy which

7     he --

8          THE COURT:  He undertook while in the Lucas

9     County jail.

10          MR. GUEDNTNER:  I was just going to say that, in

11     the Lucas County Jail after his arrest.

12          THE COURT:  There were also efforts, if memory

13     serves, to suborn or at least influence perspective

14     witnesses.  I remember that.

15          MR. GUEDNTNER:  There's no allegations of any

16     drug trafficking activities in Mr. Hill's case.  The

17     evidence in Mr. Calhoun's case also indicated that he used

18     violence and threats of violence in order to compel the

19     girls who work for him to do as he instructed them.  And

20     Ms. Sizemoore, as you might recall, is well aware of this

21     case because she prepared his presentence investigation

22     report.  Mr. Hill is not alleged to have engaged in or

23     threatened any violence.  It appears that Ms. Sizemoore's

24     report that each of the women Duane worked with have been

25     engaged in the sex trade before they ever become acquainted

1   with him.  The evidence in Mr. Calhoun's case is he had

2   been in the prostitution business for over two years.  And

3   Mr. Hill appears to have been involved to no more than six

4   months prior to his indictment in this case.

5         THE COURT:  Also there was an interstate aspect

6   of what Calhoun did, going down to Kentucky.

7         MR. GUEDNTNER:  Kentucky, New York and Michigan.

8         THE COURT:  Apparently he had other places he had

9   gone to.  I remember that.

10         MR. GUEDNTNER:  So if proportionality is the goal

11   of the U.S. Sentencing Guidelines, it seems to me that the

12   15 year sentence that Your Honor imposed on Mr. Calhoun or

13   in Mr. Calhoun's case established -- and that Duane Hill

14   whose illegal conduct, which he admits, but which is

15   significantly less than egregious than Mr. Calhoun's,

16   should receive a sentence substantially below Mr. Calhoun's

17   case.  Thank you, Your Honor.

18         THE COURT:  Mr. Hill, you have the right to speak

19   on your own behalf before I decide what I'm going to do.

20         THE DEFENDANT:  I would first like to start off

21   by apologizing to the victims and the victims' families.  I

22   also would like to apologize to The Courts for their

23   inconvenience I may have caused.  I realize that what I

24   have done -- I realize that I have done wrong and now I'm

25   going to suffer the consequences for my actions.

1    Honorable Judge Carr, I ask you to please take

2    this time to evaluate my character and evaluate me as a

3    person.  As you can see from my criminal history, I'm not a

4    trouble maker, nor am I a violent person.  I made some

5    minor mistakes along the way, but I have the upmost respect

6    for the law.  I would like the courts to know that I am a

7    Godbearing man, I have morals and values.  I am a good

8    father to my kids.  I was raised with a strong family

9    support system.  The last few years of my life leading up

10   to this incident I've been pursuing my college degree and I

11   was working part-time jobs.

12   Yes, Your Honor, I've done wrong, and I accept

13   full responsibility for my wrongdoings.  But I want you to

14   know this was not my lifestyle.  I let a five to six month

15   period of my life destroy everything I've worked hard to

16   become, and I not only disappointed myself, but I

17   disappointed my family.  I made these mistakes, but we all

18   make mistakes, no one's perfect.  I'm sorry, Your Honor.

19   Can I -- that's all.

20   THE COURT:  Ms. Sterling, anything further on

21   behalf of the government?

22   MS. STERLING:  Your Honor, just a few brief

23   comments that respond to what Mr. Geudtner had said and, of

24   course, Your Honor, Ms. Sizemoore are in the ideal position

25   to recall the facts of Mr. Calhoun's case; however, it does

1  occur to me, as I sit here, that, first of all,

2  Mr. Calhoun's case was a binding plea agreement which I

3  know is unusual not only for this courthouse but in

4  particular for you.  So I don't know if the proportionality

5  argument, you may have gone higher, I don't know.  But for

6  whatever reason, agreed to enter into a binding.

7          Secondly, I don't believe Mr. Calhoun was charged

8  or convicted of obstructing, which, as we all know, have a

9  very, very serious offense in this courthouse in

10  particular.

11          THE COURT:  And rarely prosecuted.  Sometimes

12  taken into account in the PSI.  I'm not sure, this may be

13  the second or third prosecution of that sort.

14          MS. STERLING:  And finally, Your Honor, as I

15  began my comments I'll end, at the time that this defendant

16  committed sex trafficking of a minor in Count 2, he was

17  under indictment for the exact type of conduct that is

18  promoting prostitution and didn't care.

19          THE COURT:  Shawna, you got a second, please?

20  I'm going to step down for two minutes.

21              (A side bar conference was had off the

22              record.)

23          THE COURT:  You may be seated.  Mr. Hill, I'm

24  going to sentence you to a term of 200 months with credit

25  for time served, and I'll explain my reasons to you and

1   your family and others who are here in light of the factors

2   I am required by law to take into consideration.

3          First and formally to pronounce sentence,

4   pursuant to the Sentencing Reform Act of 1984 and 18 U.S.

5   Code Section 3553(a), it's the judgment of this court that

6   the defendant be and hereby is committed to the custody of

7   the bureau of prisons to serve a term of 200 months.  You

8   will receive credit for the time spent in federal custody

9   while awaiting final disposition of this case.  I will

10  break the sentence down as follows.  As to Count 1, the

11  term is 60 months; as to Count 2, it's 200 months; as to

12  Count 3, it's 200 months.  Those terms are to be served

13  concurrently with each other.

14         As to Count 1 it will be a three year term of

15  supervised release; as to Count 2, there will be a term of

16  five years supervised release.  Counts 2 -- and 1 and three

17  years supervised release; Count 2, five years of supervised

18  release.  Those terms, likewise, will be served

19  concurrently.

20         Within 72 hours of being released from the

21  custody of the Bureau of Prisons you shall report in person

22  to the United States Pretrial Service and Probation office

23  in this district or the probation office in the district in

24  which you are released.  While on supervised release, you

25  shall comply with all standard conditions of supervised

1    release adopted by this court, of which you'll be made

2    aware with your attorneys later this afternoon before you

3    are remanded to custody, and of course upon beginning

4    supervision when you meet with your probation officer.

5           In addition, there'll be certain special

6    conditions of supervised release.  Among them, these shall

7    be that you shall diligently seek to obtain, and if you

8    diligently seek -- you shall diligently seek to maintain

9    lawful, gainful employment.  And you should cooperate fully

10    and completely with the probation officer in his or her

11    efforts to help you in that regard.  Again, I do not know

12    whether there's a special -- standard condition of

13    supervised release, however, you can -- you will not

14    possess a firearm, dangerous weapon or dangerous instrument

15    or destructive device.  You can never again in your entire

16    life possess a firearm.  Do you understand that?

17           THE DEFENDANT:  Yes.

18           THE COURT:  If you do and are caught, you will be

19    prosecuted and you'll go to jail for up to five or six more

20    years.  I simply want to warn you, that's not just a

21    condition of supervised release because you are a convicted

22    felon, the law absolutely prohibits you from possessing a

23    firearm.  Illegal possession of firearms is a very serious

24    offense and one that's prosecuted vigorously in this court.

25    In fact, this offense is probably the most significant --

1    the major kind of case that's on my docket.

2         You shall register under the Sex Offender

3    Registration Act, you must comply with the requirements of

4    that act as directed by the probation officer.  Likewise,

5    pursuant to the Adam Walsh Child Protection Act of 2006 you

6    should register as a sexual offender not later than three

7    business days from your release following your release from

8    custody; and thereafter you shall maintain that

9    registration current in each jurisdiction in which you

10   reside or are employed as a student or otherwise find

11   yourself for more than three business days.  Failure to do

12   so is a serious federal crime and that, likewise, gets

13   prosecuted.  It's also a state crime which gets prosecuted.

14   You will abide by all rules and minor protection and

15   restriction program of the United States Pretrial Service

16   and Probation Officer.  You shall submit to mental health

17   evaluation and treatment, substance abuse treatment and

18   treatment to determine whether you have developed an abuse

19   of alcohol all at the discretion of the United States

20   Pretrial Service and Probation Officer.

21        You shall not have contact with the victim or

22   victim's family, including by way of letters, communication

23   devices, visual devices, visits or any other contact of any

24   kind whatsoever, including contact through third parties.

25   You shall not own or possess any kind of camera,

1    photographic device and/or equipment, including video

2    recording equipment without the prior written approval of

3    the probation officer.  That includes cell phones or

4    anything of that sort.  You shall not access any computer,

5    internet service provider, bulletin board system or any

6    other public or private computer in network services at any

7    location, including employment or education, without the

8    prior written approval of the United States Pretrial and

9    Service and Probation Officer or The Court.  Any such

10   approval shall be subject to any conditions set by the U.S.

11   Pretrial Service and Probation Office or The Court.

12          You should submit your person, residence, place

13   of business, computer, if allowed to use one, and/or

14   vehicle to a warrantless search conducted and controlled by

15   the U.S. Pretrial Services and Probation Officer in a

16   reasonable time and reasonable manner based on reasonable

17   suspicion that you are in possession of contraband or

18   evidence of a violation of condition of release or

19   commission of a crime.  Any computer found is subject to

20   seizure and/or search without a prior warrant.  Failure to

21   submit to these conditions, these conditions, will be

22   grounds for revocation.  You shall inform any other

23   resident of any premises where you are residing that the

24   premises may be subject to search under this condition.

25          You should cooperate in the collection of DNA as

1    directed by the probation officer or the bureau of prisons.

2    In the event that you are fortunate enough to have what is

3    called a financial windfall, in other words, monies

4    received from income tax refunds, lottery winnings,

5    judgments, royalties or any other anticipated unexpected

6    financial gains, will go to outstanding court ordered

7    financial obligation.

8         I will recommend that your place of confinement

9    be at Milan Correctional Institution, which is the nearest

10   federal institution; however, given the nature of your

11   activities and the prior criminal record, the bureau may or

12   may not abide by that recommendation which I make most

13   strongly; however, it's out of my control to determine

14   where you will be placed and whether or not you will be --

15   it'll be in a location that makes it possible for your

16   family to visit you.  I think it's important that they do

17   so.  They've come here today in rather remarkable number,

18   and I hope that you and they are able to maintain contact

19   on a frequent basis so that you are aware of their support

20   and how they look forward to your return home, although

21   it's going to be a long time away.  I understand that.

22        I'll explain my reasons for my very severe

23   sentence this afternoon.  You shall pay a special

24   assessment of $300 to the United States which is due

25   immediately.  It will be taken from your prison earnings.

1    And you shall also pay restitution of $240 as restitution

2    to the victim of this offense.  And that shall be paid

3    through the United States District Court.  And that payment

4    is also due and payable immediately to be taken from your

5    prison earnings.  In the event that you still owe any

6    money, which I can't imagine you will, upon release from

7    confinement, you'll be required to pay $25 a month until

8    that amount is paid.  Any other conditions I should

9    specifically note, Ms. Sizemoore?

10            PROBATION:  No, Your Honor.

11            THE COURT:  I have considered the Section 3553(a)

12   factors that I'm required to consider in determining what

13   sentence is sufficient but not greater than necessary to

14   accomplish the purposes of sentencing.  A very important

15   factor in this instance is the very high degree of

16   seriousness of this offense.  You basically have

17   participated in what used to be called the corruption of a

18   minor.  I think that that remains a fair and accurate term.

19   That young woman, no matter how she may have appeared or

20   what she did, was still a child, and that is why the law

21   protects her.  And no one of that age should be subjected

22   and even given the opportunity to be subjected to or given

23   the opportunity to engage in the conduct which you

24   undertook to facilitate and did facilitate.  One does not

25   even have to read the victim impact statement, which I have

1   done, and it is a powerful condemnation of what you did to

2   her and its lasting effects.

3           There'll be a time when you come home and you're

4   out of prison and you've served your time and go about your

5   life.  That young woman will bear the scars of your conduct

6   for her entire life.  She will never overcome them.  She

7   will never outgrow them.  They'll be a fact and feature of

8   her life forever.  You didn't think about that, perhaps she

9   didn't think about that.  But in the eyes of the law and

10  society, she was uncapable of understanding the

11  consequences that you helped to cause and to have happen.

12  Very serious offense.  And I want people in this community

13  to understand men who treat women, especially young women

14  the way you did, when they are caught violating federal law

15  will be convicted.  And when they are convicted, they will

16  be punished severely, more severely than most defendants

17  who appear before me who have committed what some might

18  label less serious, or excuse me, more serious offenses.

19          My sentence is motivated in substantial part by

20  the seriousness of this offense, and as well what I view to

21  be a need for public deterrence.  The cases on my docket

22  and elsewhere in this court have made clear that somehow

23  our community has become a sore city for prostitution, not

24  just here where you were active, but elsewhere within this

25  region.  That has to come to a stop.  Men like you who prey

1    on young women are going to go to prison for a long time

2    until men like you learn that that's not something you

3    should be doing to the children and young women of our

4    community, even adult young women.  So I am seeking, to the

5    extent -- to the maximum extent possible, to cause others

6    in your position who may be tempted to do as you did, to

7    understand the risk that they are taking.  It's my sincere

8    hope, as I've often said before, that the United States

9    government will do all in its power to see that this

10   sentence and the circumstances are communicated to the

11   public.  After that, whether the public pays attention and

12   other young men heed this lesson that I'm trying to have

13   them learn through this sentence is up to them.  And if

14   they do not, they will come back here, and either one or

15   two of my colleagues will do to them what I am doing to

16   you.  But I want the record to be made clear that one of

17   the purposes I'm trying to serve is public deterrence.

18          Unfortunately, the public all too often is

19   unaware, as you certainly were unaware, you're under

20   indictment in Wood County in April, and in July what are

21   you doing?  You're facilitating the prostitution of a 15

22   year old child.  The fact of indictment, the risk of

23   whatever sentence you were exposed to, obviously made no

24   difference to you.  You're going to go about doing the

25   business the way you wanted to do it for whatever personal

1    gain and gratification you could attain.  You didn't know

2    the consequences.  You were no doubt dumb struck when

3    Mr. Geller first told you the kind of time you were looking

4    at.  You had no idea.  That's because the public isn't

5    paying attention.  I hope every one of you in this room

6    makes clear to your friends, your neighbors and others with

7    whom you deal what will happen if others do what Mr. Hill

8    did.  And they can walk out on this lesson if they want,

9    shame on them, but I mean that seriously.  Let your friends

10   and neighbors know what happens when people get caught

11   corrupting young children, turning them out into

12   prostitution and they come before this court.  And not just

13   this Judge, but every Judge in this court.  In fact, I

14   suspect I may have been more lenient than some of my

15   colleagues might have been under the same circumstances.

16   The word has to get out into our community that doing this

17   to young girls will not be tolerated and will cost those

18   who commit crimes like this to lose a very substantial

19   portion of what should be the best and most productive

20   years of their lives.

21          I hope that this sentence enhances respect for

22   the law.  I believe, all things considered, that it is

23   just.  I have taken the defendant's background, history and

24   characteristic into full and complete account.  I think

25   that this sentence also is necessary to make clear to him

1    there's nothing else in his past, that to violate the law

2    has its consequences and will have its consequences.

3    People don't get it.  Federal court and federal laws are

4    different.  They are vastly more punitive and vastly more

5    harsh.  In a case like this, this is exactly the way it

6    should be, and it will be in cases that come before me like

7    this in the future.

8            And I also think that this sentence serves what

9    in this case clearly is a necessary function and purpose,

10    and that is simple incapacitation.  Your days of corrupting

11    the children of this community are done.  And that's a very

12    important purpose to serve.  Mr. Geudtner quite properly

13    called my attention to the case of Mr. Calhoun.  In some

14    respect, his conduct was worse than yours.  It also

15    involved a young woman taken across state lines down to

16    Kentucky for purposes of prostitution.  There was an

17    indication in his background that he had done so on a

18    number of occasions to other states with other women.  He

19    also undertook, like yourself, despite being indicted in

20    that case in this court to engage in drug dealing while an

21    inmate of the Lucas County Jail.  I believe that was the

22    circumstances; is that correct, Ms. Sterling?

23            MS. STERLING:  Your Honor, I am not familiar with

24    the facts of that case.

25            THE COURT:  Ms. Sizemoore, is that right?

1          PROBATION:  He was reaching out to family members

2    to continue dealing drugs.

3          THE COURT:  That's right.  On the other hand, he

4    pled guilty.  He accepted responsibility, and he got the

5    credit for that.  And the conduct that he committed while

6    under indictment was not the sort of conduct that you

7    committed while under indictment down in Wood County.  And

8    I think that there is a difference between your case and

9    his that accommodates for the fact that you're going to

10   serve 20 more months than he did.

11         Anything further that I should mention with

12   regard to Section 3553(a) factors, Ms. Sterling?

13         MS. STERLING:  No, Your Honor.  Thank you.

14         THE COURT:  Mr. Geller, Mr. Geudtner, anything

15   further that I should touch upon with regard to the --

16         MR. GELLER:  No, Your Honor.

17         THE COURT:  -- Section 3553(a) factors?  Does any

18   party have any objection to any part of these proceedings,

19   not just the sentencing proceeding, but any part of the

20   prior proceedings that has not previously been made?

21         MS. STERLING:  Nothing on behalf of the

22   government, Your Honor.  Thank you.

23         THE COURT:  Mr. Geller?

24         MR. GELLER:  Not at this time.

25         THE COURT:  Mr. Geudtner?

1        MR. GUEDNTNER:  Excuse me, we reserve our right

2    to appeal.

3        THE COURT:  Absolutely.  And once again,

4    Mr. Hill, you have received a very severe sentence.  I

5    understand that.  Let me say a couple things.  Some day you

6    will return home.  You will be on supervised release for a

7    term of five years.  I hope that when you come back, you

8    understand that there are rules, rules that not just

9    society imposes which you broke and which is why you are

10   here, but rules that I have imposed in the terms and

11   conditions of supervised release.  Those rules are not

12   optional.  They are court orders.  The Judge, and quite

13   candidly, I probably won't be here given my age, but

14   whatever Judge is responsible for overseeing your term of

15   supervised release, will expect you to comply with what

16   then will be his or her orders.  Do not think you can pick

17   and choose which of those requirements you can satisfy and

18   which you can disregard.  You are expected to comply with

19   each and every one of them.

20       And one final thing, overcome the habit of being

21   anything other than entirely truthful with the probation

22   officer.  If you're not truthful with the probation officer

23   in federal court, you are lying to the United States

24   District Judge.  And I hope how I have conducted myself

25   today makes you understand that United States District

1   Judges, and I am not alone in this, are not tolerant of

2   behavior that they find unacceptable.  So keep that in

3   mind.  Things are different in this court than they are in

4   the Municipal Court or the Common Pleas Court.  And keep

5   that in mind.  The Judge is your ultimate probation

6   officer.  Work with The Judge, work with the office.  You

7   will, in fact, be able to get a job.  You will, in fact, be

8   able to live the kind of life that apparently, with a lot

9   of exceptions, but at least in terms of serious violations

10  you had avoided those.  But if you work it, you can, in

11  fact, spend the remaining half of your life, and there'll

12  be at least that much that will remain to you being

13  productive, and being a law abiding.  And the choice will

14  be yours.  Anything further from the government?

15          MS. STERLING:  No, Your Honor.  Thank you.

16          THE COURT:  Ms. Sizemoore, anything further?

17          PROBATION:  No, Your Honor.

18          MR. GELLER:  No, Your Honor.

19          MR. GUEDNTNER:  No.

20          THE COURT:  That will conclude this it

21  proceeding.

22

23

24

25

1

2

3                    C E R T I F I C A T E

4

5          I certify that the foregoing is a correct transcript

6    from the record of proceedings in the above-entitled matter.

7

8    s:/Angela D. Nixon

9    _____          _____

10   Angela D. Nixon, RMR, CRR            Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25